**KEYSTONE TOBACCO CO., INC., Plaintiff,**

v.

**UNITED STATES TOBACCO CO., et al., Defendants.**

**Mutual Wholesale Services, Inc., Plaintiffs,**

v.

**United States Tobacco Co., et al., Defendants.**

**Nos. CIV.A.00–1415 PLF, CIV.A.00–1454 PLF.**

United States District Court, District of Columbia.

Dec. 6, 2002.

Michael David Hausfeld, Paul T. Gallagher, Brent William Landau, Cohen, Milstein, Hausfeld & Toll, P.L.L.C., Washington, DC, Steven A. Kanner, Much, Shelist, Freed, Denenberg & Ament, Chicago, IL, for Plaintiff.

Robert Stephen Bennett, Gary Alan MacDonald, Rachel A. Mariner, James A. Keyte, Chris T. Athanasia, Karen M. Hoffman, Skadden, Arps, Slate, Meagher & Flom, LLP, Washington, DC, Neal R. Stoll, Skadden, Arps, Slate, Meagher & Flom, LLP, New York, NY, Margaret Moran Zwisler, Howrey, Simon, Arnold & White, LLP, Washington, DC, for Defendants.

### OPINION AND ORDER

PAUL L. FRIEDMAN, District Judge.

This matter is before the Court for consideration of Plaintiffs' Emergency Motion to Preclude Settlement Discussions with Individual Plaintiffs, filed on November 5, 2002. In their motion, plaintiffs assert that the defendants in this action (collectively, "UST") sought to take advantage of the interim period between the oral argument of the class certification motion and the Court's decision on that motion to improperly approach individual putative class members in an attempt to settle the case with as many direct purchasers as possible before certification. Specifically, plaintiffs assert that defendants offered insufficient consideration for their proposed settlements, and that they provided incomplete, inaccurate and misleading information in their communications. Defendants filed an opposition, plaintiffs filed a reply, and the Court heard argument on November 20, 2002.

## I.  BACKGROUND

Plaintiff Keystone Tobacco Co., Inc. filed a class action lawsuit against defendants on June 16, 2000. The Court subsequently consolidated the Keystone suit with a similar suit filed by plaintiff Mutual Wholesale Services, Inc. Plaintiffs together filed a consolidated amended complaint on January 8, 2001, alleging that defendants engaged in unlawful activities to stifle competition in the moist, smokeless, non-chewing tobacco market in the United States. Plaintiffs define the class to include:

all persons and entities in the United States (excluding defendants, their co-conspirators, their subsidiaries, affiliates, officers, directors, and employees, and government entities) who purchased moist snuff products directly from the Defendants, or any subsidiary or affiliate thereof, at any time during the period from January 1, 1990 to the present (the "Class Period").

Consol. Am. Compl. ¶ 18. On October 23, 2002, the Court heard argument on plaintiffs' motion to certify this action as a class action lawsuit. The Court took the matter under advisement.

The day after the oral argument on class certification, defendants distributed to UST's direct purchasers, who are the putative class members in this case, a packet of materials proposing a settlement offer for the claims currently alleged by plaintiffs. The correspondence included a cover letter dated October 24, 2002, addressed to "our valued customers" and signed by Murray S. Kessler, the President of UST ("Kessler Letter"), a memorandum assessing the merits of this lawsuit and the settlement offer ("Settlement Memorandum"), and a proposed settlement agreement. *See* Defendants' Opposition to Plaintiffs' Emergency Motion to Preclude Settlement Discussions with Individual Plaintiffs ("Defs.' Opp."), Ex. C. In the settlement proposal, UST offers "in exchange for a release by the customer of all claims asserted in the D.C. class action . . . not to reduce before December 31, 2003, the 'cash discount' described in the Payment Terms of UST's Terms and Conditions. In addition, UST agrees to defend and indemnify the customer in any suit by retailers or consumer producers of moist snuff alleging violations of state or federal antitrust laws." Settlement Memorandum. The Kessler Letter sets a deadline of November 21, 2002 for acceptance of the settlement offer.

The Kessler Letter states that a copy of the complaint is enclosed, which by definition includes all of the assertions made by plaintiffs and provides notice of the identities of plaintiffs' class counsel with their addresses and telephone numbers. *See* Kessler Letter. Although the complaint

was not in fact included in the initial mailing, counsel represented at oral argument that this was an inadvertent mistake, as Mr. Kessler's declaration also states. *See* Defs.' Opp., Ex. B, Declaration of Murray S. Kessler ¶ 11. Defendants now have provided a copy of the amended complaint to each of the direct purchasers. *See* Notice of Filing of Settlement Communications to Direct Purchasers Enclosing Complaint and Extending Settlement Order ("Compl.Notice"), Ex. 1, Letter from Murray A. Kessler, November 22, 2002 ("Kessler Complaint Letter"). Furthermore, as it agreed to do at oral argument, UST has notified the direct purchasers that the company will extend the deadline for the return of a signed settlement agreement to December 15, 2002 in order to allow putative class members adequate time to assess their positions in light of the amended complaint. *See id.*[1]

Plaintiffs argue that two factors independently demonstrate the wrongful nature of defendants' settlement endeavor. First, plaintiffs assert that defendants offered inadequate consideration to the individual class members in exchange for a release from the claims currently pending against defendants in this matter. *See* Memorandum in Support of Plaintiffs' Emergency Motion to Preclude Settlement Discussions with Individual Plaintiffs ("Pls.' Mem.") at 7–9. Second, plaintiffs assert that in seeking resolutions of the case with individual putative class members, the defendants unlawfully provided incomplete, inaccurate and misleading information about this litigation and the value of the plaintiffs' claims. *See id.* at 10. Plaintiffs also assert that because defendants' sales representatives are the people soliciting the settlements, UST has created

---

1. The Kessler Complaint Letter does not affirmatively state that those direct purchasers who have already signed settlement agreements may withdraw from those agreements without consequence if they wish to do so after reviewing the complaint.

an inherently coercive environment designed to induce premature settlements by individuals with insufficient information. *See id.* at 10–12. In light of these alleged improprieties, plaintiffs argue that the Court has a fiduciary duty to intervene and prevent harm to putative class members. *See id.* at 11.

Defendants respond that settlements in class actions are to be encouraged, that there is no legal impediment that prevents defendants or their representatives from approaching individual putative class members to discuss the possibility of settlement, and that defendants have neither misled nor coerced those with whom they have communicated. *See* Defs.' Opp. at 9–10, 19–21. Defendants claim that until a class is certified, all communications in pursuit of such settlements, even if misleading, are permitted. *See id.* at 12. More importantly, they argue, the communications UST sent are not misleading, UST has provided accurate information to sophisticated business people capable of making decisions whether to enter into settlements, and these business people are not being threatened or coerced. *See id.* at 18. Finally, defendants assert that if the Court is inclined to limit defendants' communications with putative class members, it may only do so narrowly and on the basis of a clear evidentiary record which in this case, defendants say, is sorely lacking. *See id.* at 19–20.

## II. DISCUSSION

### A. *Assessing Pre–Certification Settlement Offers*

■ As an initial matter, the Court rejects defendants' position that it has no authority to limit communications between litigants and putative class members prior to class certification. *See Gulf Oil Co. v. Bernard,* 452 U.S. 89, 100, 101 S.Ct. 2193, 68 L.Ed.2d 693 (1981) (affirming district court's authority to limit communications between counsel and putative class members, subject to restrictions mandated by First Amendment); *Ralph Oldsmobile Inc. v. General Motors Corp.,* No. 99 Civ. 4567, 2001 WL 1035132, at *2, 2001 U.S. Dist. LEXIS 13893, at *5 (S.D.N.Y. Sept. 7, 2001) (court's power to restrict communications between parties and potential class members exists prior to class certification); *Jenifer v. Delaware Solid Waste Authority,* Nos. 98–270, 98–565, 1999 WL 117762, at *2, 1999 U.S. Dist. LEXIS 2542, at *8 (D.Del. Feb. 25, 1999) ("the Court does have the requisite authority to limit contacts with putative class members"); *see also McReynolds v. Sodexho Marriott Services, Inc.,* No. 01–0510, Order (D.D.C. May 24, 2001) (ESH).

In considering whether to restrict defendants' communications with putative class members, the Court acknowledges the competing policy arguments presented by the parties. Defendants are correct that settlements are looked upon favorably by the courts, particularly in complex class actions in which the Court's resources may be heavily taxed by prolonged litigation. *See In re Exxon Valdez; Icicle Seafoods, Inc.,* 229 F.3d 790, 795 (9th Cir.2000) ("the general policy of federal courts to promote settlement before trial is even stronger in the context of large-scale class actions"). Settlement cannot come, however, at the expense of the class action mechanism itself to the detriment of putative class members. The distribution of misleading information in order to exact early settlement agreements from putative class members or the use of coercive tactics is just the kind of wrongful conduct that undermines the class action. As Judge Schwartz concluded in *Jenifer:*

The effect of a defendant attempting to influence potential plaintiffs not to join a potential class action is just as damaging

to the purposes of Rule 23 as a defendant that influences members of an already certified class to opt out.... In both scenarios, improper communication could diminish the size of the class or potential class, and thus, reduce the potential liability.

*Jenifer v. Delaware Solid Waste Authority,* 1999 WL 117762, at *2, U.S. Dist. LEXIS 2542, at *9 (internal citation omitted); *see also Gulf Oil Co. v. Bernard,* 452 U.S. at 99, 101, 101 S.Ct. 2193 (class actions serve an important function in our civil justice system and "it is not appropriate to promote [a preference for voluntary settlement of disputes] by restricting information relevant to the [putative class member's] choice").

The Supreme Court stated in *Gulf Oil* that "[b]ecause of the potential for abuse [of the class action process], a district court has both the duty and the broad authority to exercise control over a class action and to enter appropriate orders governing the conduct of counsel and parties." *Gulf Oil Co. v. Bernard,* 452 U.S. at 100, 101 S.Ct. 2193. In order not to impinge on the parties' right to free speech, however, any such orders must be narrowly tailored, because "the mere possibility of abuses does not justify routine adoption of a communication ban that interferes with the formation of a class or the prosecution of a class action in accordance with the Rules." *Id.* at 104, 101 S.Ct. 2193. It follows that an order limiting communications between parties and putative class members must "be based on a clear record and specific findings that reflect the weighing of a need for a limitation and the potential interference with the rights of the parties ... [and that] such a weighing—identifying the potential abuses being addressed—should result in a carefully drawn order that limits speech as little as possible, consistent with the rights of the parties under the circumstances." *Id.* at 101, 101 S.Ct. 2193.

B. *The Court Will Not Examine the Issue of Consideration*

■ Plaintiffs argue that one reason the Court should intervene is that the consideration offered by defendants in exchange for a release from liability is nominal, and therefore the settlement offers are unlawful solicitations for exclusion. *See* Pls.' Mem. at 7–8. In examining the settlement offer made to putative class members, the Court does not think it appropriate in the first instance to evaluate the consideration offered, but will focus instead on whether defendants may be "misleading ... class members about the strength and extent of their claims and the alternatives for obtaining satisfaction of those claims." *In re General Motors Corp. Engine Interchange Litig.,* 594 F.2d 1106, 1139 (7th Cir.1979). The Court adopts the Seventh Circuit's three-pronged standard for evaluating whether such obfuscation is taking place: "[A]n offer to settle [made to individual class members] should contain sufficient information to enable a class member to determine (1) whether to accept the offer to settle, (2) the effects of settling, and (3) the available avenues for pursuing his claim if he does not settle.... [J]udicial examination of the offer to settle individual claims largely entails only consideration of the accuracy and completeness of the disclosure." *Id.; cf. In re Shell Oil Refinery,* 152 F.R.D. 526, 536 (E.D.La.1989) (directing application of this test to assess settlement offers made to individual class members).

■ Defendants meet the requirements of this test. First, the Court concludes that the putative class members have received sufficient information to enable them to assess the settlement offer. As defendants point out, the direct purchasers are business people in the industry at issue

in the class action; they are not unsophisticated. *See* Defs.' Opp. at 18. The purchasers received the Kessler Letter and the Settlement Memorandum, which describe the present case, the related *Conwood* decision and the planned discount reduction, and note the existence of additional pending lawsuits. *See* Kessler Letter; Settlement Memorandum. The Kessler Complaint Letter further details the planned discount reduction. *See* Kessler Complaint Letter. The direct purchasers also received the complaint (albeit belatedly), which provides information allowing them to assess the value of the settlement offer in light of plaintiffs' allegations.[2] The direct purchasers thus received sufficient information to permit them to determine whether to accept the offer to settle.

Second, the settlement agreement enclosed in the mailings clearly explains the effects of settling. It indicates that if they agree to accept the proffered settlement, the direct purchasers would be discharging UST and additional delineated companies from any and all claims that the direct purchasers had or will have under "any federal or state antitrust conspiracy, monopoly, unfair competition, unfair trade practices, price discrimination, unitary pricing or other statutory or common law, including, without limitation, the Sherman Act, 15 U.S.C. § 1 *et seq.,* on account of or which in any way arose out of or resulted from the manufacture, purchase, marketing, distribution or sale in the United States of moist snuff." Defs.' Opp., Ex. C., Settlement Agreement ¶ 2.1. In exchange, UST agrees to indemnify or defend the direct purchaser against any claim brought against it by purchasers of moist snuff products alleging that UST's past conduct caused injury to such purchasers in viola-

tion of state or federal antitrust laws, and not to reduce before December 31, 2003 the "cash discount" described in the Payment Terms of UST's Terms and Conditions. *See* Defs.' Opp., Ex. C., Settlement Agreement ¶¶ 2.3, 2.4. Thus, the impact of settlement is clearly spelled out, and seeking the advice of counsel is recommended to help putative class members understand the effects of settling.

Third, the complaint disseminated to the putative class members not only explains the claims in plaintiffs' own words, but also provides the direct purchasers with the names, addresses and phone numbers of class counsel if the putative class member wishes to learn more about the merits of the claims before giving them up. *See* Compl. Notice, Ex. 1, Amended Complaint. In light of the foregoing, the Court concludes that the correspondence with the putative class members and the settlement offer itself are not misleading and provide adequate information so that the direct purchasers can investigate alternatives for relief. The settlement correspondence meets the *General Motors Engine* test. The Court will not examine further the issue of consideration.

### C. Were there Improper Communications with Putative Class Members?

Plaintiffs next assert that defendants unlawfully provided incomplete, inaccurate and misleading information about this litigation and the value of the plaintiffs' claims, and that defendants' sales force improperly pressured individual direct purchasers to sign the settlement agreement. As the Court explained during oral argument, it would be greatly troubled by communications from defendants and/or their representatives to putative class

---

**2.** The Kessler Letter and the Kessler Complaint Letter also advised putative class members to consult with their own counsel before making a decision whether to settle. *See* Kessler Letter; Kessler Complaint Letter.

members that were incomplete, inaccurate, purposely misleading or coercive. Defendants offer the written communications sent by UST to the putative class members to demonstrate that the settlement overtures it has made are proper. In response, plaintiffs offer declarations from a direct purchaser and from plaintiffs' counsel that seek to show that UST sales representatives are acting in an inappropriate, if not misleading manner in their dealings with direct purchasers.

After examining the written settlement materials, the Court concludes that while the Kessler Letter, the Memorandum and the Kessler Complaint Letter contain some self-serving advocacy for defendants' position, it cannot find that the statements therein are inaccurate or misleading. The correspondence itself does not appear to contain any incorrect assertions of fact regarding the current class action or the terms of the settlement agreement. In addition, it was represented at oral argument that the Kessler Letter and its accompanying memorandum were written by lawyers, either by outside counsel or by the Office of the General Counsel of UST, and that the sales representatives who were delivering the letters or otherwise discussing the settlement agreement with direct purchasers were provided scripts delineating what they could legitimately say, also prepared by UST's Office of the General Counsel. The Kessler Letter and the Kessler Complaint Letter advised customers to consult with their own lawyers before deciding to settle the case or sign the releases. *See* Kessler Letter; Kessler Complaint Letter. All of this suggests that while trying to encourage settlement, the defendants and their counsel took steps to avoid providing inaccurate or misleading information and to assure that they were in compliance with established law.

These steps, however, have not been sufficient to protect against wrongful communications between some of defendants' representatives and putative class members. Mr. Curt Dass, a direct purchaser in Tyler, Minnesota, submitted a declaration describing his interaction with a UST salesperson regarding the settlement offer. *See* Notice of Filing, Declaration of Curt Dass ("Dass Decl.") ¶ 2. Mr. Dass states that Mr. Pete Jackovich, the UST regional representative, contacted Mr. Dass and urged him to sign the agreement. *See id.* ¶ 5. At that time, Mr. Dass indicated to Mr. Jackovich that he was not inclined to accept the settlement offer. *See id.* Mr. Jackovich then contacted Mr. Dass on two additional occasions, and at one point told Mr. Dass that "every other wholesaler in Minnesota has signed the Settlement Agreement, and if you don't, you are going to lose your discount." *Id.* ¶ 6, 8. When asked about the then-missing complaint, Mr. Jackovich told Mr. Dass the pleading was not included because it was "so long." *Id.* ¶ 9. Mr. Dass states that Mr. Jackovich was unable to provide any detailed information regarding the discount reduction. *See id.* ¶ 7.

Plaintiffs' counsel, Mr. Paul Gallagher, avers that at least 12 other direct purchasers have contacted him concerned about UST salespersons' practices in seeking settlement. *See* Notice of Filing, Declaration of Paul T. Gallagher ("Gallagher Decl.") ¶ 3. According to Mr. Gallagher, a UST representative presented settlement materials to one direct purchaser and instructed that direct purchaser to sign the agreement without reading the materials. *See id.* ¶ 8. In addition, this UST salesperson read "something" regarding settlement conditions which was not in the settlement materials, but would not let the direct purchaser view the document from which the salesperson read. *Id.* Mr. Gallagher further asserts that another UST repre-

sentative called a direct purchaser on November 21, 2002, the day before the initial deadline to accept the settlement offer, and pressured the direct purchaser to sign the release. *See id.* at 12. When questioned about the December 15, 2002 deadline extension, the representative denied the fact that the deadline for acceptance of the offer had been extended and informed the direct purchaser that if the direct purchaser did not sign on that day he would lose his discount. *See id.* This direct purchaser subsequently signed the settlement agreement because he felt he otherwise would be "penalized." *Id.* Mr. Gallagher also states that "most" of the direct purchasers who contacted plaintiffs' counsel refrained from filing their own affidavits or declarations for fear of harming their ongoing business relationship with defendants. *Id.* ¶ 10.

In light of the declarations of Mr. Dass and Mr. Gallagher, the Court's concern that wrongful contacts have taken place is not allayed completely by the settlement materials, however carefully they may have been drafted. Presumably the Jackovich statement that every other wholesaler in Minnesota already had signed the agreement was a misrepresentation, and his explanation for the absence of the complaint was demonstrably inaccurate. Similarly, the statement by another UST representative to a direct purchaser that the deadline had not been extended was a misrepresentation (unless, of course, he was authorized to act for UST but given incomplete or inaccurate information by the company).

There are three possible explanations for the misrepresentations and inaccurate statements made by some members of the UST sales force: (1) the script provided to the salespeople is insufficient in instructing them how to present the settlement materials correctly; (2) the script (or other instructions given) directs the salesforce to act in an inappropriate, misleading or coercive manner; or (3) UST has failed to provide complete and accurate information to its representatives and proper oversight of settlement overtures to ensure that such conduct does not take place. In view of the representations made in Court by both outside counsel and the General Counsel of UST, the Court is reluctant to accept either of the first two possibilities. The Court therefore must conclude that despite best efforts, those in management and those trained in the law simply have failed to control adequately the actions of at least some of their subordinates. While the Court agrees that it is inappropriate for a court "simply to interpose [itself] in the business relationship … each time [a direct purchaser] files a putative class action," *Ralph Oldsmobile Inc. v. General Motors Corp.*, 2001 WL 1035132, at *6, 2001 U.S. Dist. LEXIS 13893 at *16, there are steps that the company president, the company's General Counsel and outside counsel can take—and oversight the Court can provide—to ensure that improper communications can be minimized if not eliminated and that only accurate information is provided.

■ The Court does not believe that plaintiffs' declarations demonstrate coercion, which occurs in this context when "the conduct somehow overpowers the free will or business judgment of the potential class members." *Jenifer v. Delaware Solid Waste Authority*, 1999 WL 117762, at **9–10, 1999 U.S. Dist. LEXIS 2542, at *16. While an ongoing business relationship obviously increases the possibility that communications between defendants and putative class members are coercive, *Ralph Oldsmobile Inc. v. General Motors Corp.*, 2001 WL 1035132, at *2, 2001 U.S. Dist. LEXIS 13893 at *7, the existence of such a relationship is not enough by itself

to justify precluding the communication of settlement offers to putative class members. *See Jenifer v. Delaware Solid Waste Authority,* 1999 WL 117762, *4, 1999 U.S. Dist. LEXIS 2542, at *15 (where an ongoing business relationship exists between litigants, the court "must still require a clear record of threatened abuses" in order to justify "an interference with [defendants'] speech"); *Burrell v. Crown Central Petroleum, Inc.,* 176 F.R.D. 239, 244 (E.D.Tex.1997) (same). Several of the communications at issue here were improper because they misrepresented basic facts as to the settlement agreement and relevant deadlines, but the actions on the part of the salespeople did not overpower the business judgment of the direct purchasers. Like the proposed agreement in *Jenifer,* the communications relate "to a business proposition which potential class members are free to reject if they decide the costs outweigh the benefits," *Jenifer v. Delaware Solid Waste Authority,* 1999 WL 117762, *10, 1999 U.S. Dist. LEXIS 2542, at *17, and the direct purchasers are sophisticated business people who have been advised to consult with their own counsel for assistance in assessing the proposal.

Based on the record before it, the Court concludes that plaintiffs have not presented a "clear record" of abuses that would justify precluding settlement discussions with direct purchasers. Still, certain narrow limitations on the defendants' conduct should be required in order to ensure that UST representatives do not mislead putative class members or act in a coercive or threatening manner while proposing settlement. Accordingly, it is hereby

ORDERED that plaintiffs' emergency motion to preclude settlement discussions with individual plaintiffs [53–1] is DENIED; it is

FURTHER ORDERED that no party, its representatives or its counsel may provide putative class members with misleading or inaccurate information, or make misleading or inaccurate statements, about the pending lawsuit or the proposed settlement, or attempt to coerce class members through threats or misrepresentations with respect to their decisions as to whether to accept the proposed settlement offered by defendants; it is

FURTHER ORDERED that defendants' outside counsel shall review the script provided to defendants' sales representatives in light of this Opinion, and revise it if necessary, to ensure that the script does not include any inaccurate or misleading information and does not suggest that the sales representatives engage in any behavior that improperly pressures putative class members to accept the settlement agreement; it is

FURTHER ORDERED that UST immediately must inform its sales force, including sales force supervisors, of the allegations in the Dass and Gallagher declarations and the substance of this Opinion; it is

FURTHER ORDERED that UST shall transmit at least the ordering paragraphs of this Opinion and Order to any individual who is authorized to make settlement overtures to, or to engage in settlement discussions with, putative class members, and shall advise those individuals that violations of this Order could result in the imposition of sanctions on the company or on individual company representatives and/or the setting aside of any settlement agreements demonstrably obtained through misrepresentations or coercion; it is

FURTHER ORDERED that if plaintiffs' counsel learn that such behavior is taking place, counsel shall promptly notify the Court by motion, supported by declarations, so that the Court may consider

what if any sanctions to impose, including (if appropriate) contempt of court; and it is

FURTHER ORDERED that any direct purchaser who entered into a settlement agreement prior to receiving a copy of the complaint shall be advised by letter to be mailed on or before December 13, 2002, that UST will permit it to withdraw from the settlement agreement if a review of the complaint has persuaded the direct purchaser that its decision to settle was ill-advised; but that such request must be mailed to UST on or before January 7, 2003. Defendants shall submit a report to the Court representing that UST has complied with this directive and identifying the number of putative class members (if any) who have withdrawn from a settlement agreement pursuant to this Opinion and Order.

SO ORDERED.