In re M.L. STERN OVERTIME LITIGATION.

No. 07–CV–0118–BTM (JMA).

United States District Court, S.D. California.

Jan. 4, 2008.

Alan R. Plutzik, Lawrence Timothy Fisher, Schiffrin Barroway Topaz and Kessler, Walnut Creek CA, Gerald D. Wells, III, Joseph H. Meltzer, Katherine Bornstein, Robert J. Gray, Schiffrin Barroway Topaz and Kessler, Radnor PA, Gregory Yu, Joseph Cho, Mark Yablonovich, Shawn Westrick, Initiative Group LLP, Los Angeles CA, for Plaintiffs.

James Richard Ballard, Sarah R. Brite Evans, Schwartz Semerdjian Haile Ballard & Cauley, San Diego CA, for Defendants.

**ORDER RE PLAINTIFFS' MOTION TO LIMIT EX PARTE COMMUNICATIONS BETWEEN DEFENDANT AND MEMBERS OF THE PROPOSED CLASS, ETC.**

JAN M. ADLER, United States Magistrate Judge.

**I. INTRODUCTION**

On November 2, 2007, Plaintiffs filed a Motion to Limit Ex Parte Communications Between Defendant and Members of the Proposed Class, to Nullify Executed Settlement and Release Agreements, and to Impose Sanctions, Attorneys' Fees and For Other Relief ("Motion"). [Docket No. 35] On November 21, 2007, Defendant filed an Opposition in response to the Motion. [Docket No. 36] On November 30, 2007, Plaintiffs filed a Reply to Defendant's Opposition. [Docket No. 37] After a thorough review of the parties' submissions and applicable law, and for the reasons set out herein, the Court **GRANTS IN PART AND DENIES IN PART** the Motion.

**II. BACKGROUND OF PLAINTIFFS' MOTION**

On October 12, 2007, shortly before a previously-scheduled telephonic Case Management Conference was to commence, counsel for Plaintiffs contacted the Court by way of a six-page, single-spaced letter ("Wells Letter"), strenuously objecting to a letter dated September 28, 2007 from Defendant's CEO, Milford L. Stern, to "All Account Executives" regarding "Class Action Litigation" ("Stern Letter"). (Decl. of Gerald Wells filed in support of the Motion, exhs. A & B.) The Wells Letter characterized the distribution of the Stern Letter to Account Executives currently employed by Defendant as "inappropriate, prejudicial to plaintiffs, [and] disrespectful to the judicial process . . . ." (Wells Letter at 1.) After discussing the matter with counsel for the parties, the Court ordered:

Defendants shall immediately, and in any event not later than the close of business on October 15, 2007, issue a communication by electronic mail to "All Account Executives to whom the September 28, 2007 letter was sent." The communication shall inform the recipients that the appropriateness of the September 28, 2007 letter has been called into question by Plaintiffs' counsel and that the issue of the appropriateness of the letter has now been placed before the Court for a ruling. The communication shall suspend the October 19, 2007 response deadline set out in the letter and shall suspend the offer of settlement contained in the letter until such time as the Court rules on the issue. Defendants shall provide a copy of the electronic mail communication to counsel for Plaintiffs and

the Court[. The Court then set a briefing schedule on the Motion.]

(Order filed October 12, 2007 [Doc. No. 34] at 1–2.)

In the Motion, Plaintiffs argue that the Stern Letter is misleading, coercive, and violates California Rules of Professional Conduct, and they contend that the Court should take curative and punitive action in response to it. Plaintiffs do not, however, provide actual evidence that Account Executives experienced coercion or felt misled by the Stern Letter and the accompanying materials. Rather, Plaintiffs essentially want the Court to infer that the Stern Letter is coercive and misleading because an unusually high percentage of Account Executives executed the Settlement and Release Agreement, because the employer/employee relationship is inherently coercive in this context, and because the Stern Letter contains the statement that the Plaintiffs' current settlement demand "would severely impact the company's net capital requirements and make it difficult for M.L. Stern to stay in business and *out of bankruptcy.*" (Stern Letter at 2 (emphasis added).) [1]

Plaintiffs seek the following: (1) an order to Defendant to cease and desist from any further communication with proposed class members regarding the lawsuit; (2) copies of all written communications Defendant has had with any putative class member that concerns the lawsuit; (3) copies of the "97 complete surveys" Defendant cites in the Stern Letter and copies of all executed "Settlement and Release Agreements;" (4) a curative letter advising all recipients of the Stern Letter that it was factually inaccurate, misleading, and coercive; (5) an order deeming any executed releases void and unenforceable; and (6) sanctions against Defendant, including an award of attorneys' fees and costs. (Motion at 23.) Defendants oppose the Motion, contending that pre-certification communications with putative class members are constitutionally protected and that the Stern Letter is not improper, misleading, or coercive. (*See generally,* Opposition.)

## III. DISCUSSION

### A. *The Communications Between Defendant And The Current Account Executives.*

According to the parties' submissions, after this action was filed, Defendant distributed a survey to its Account Executives seeking information related to the litigation. (Decl. of Milford L. Stern filed in support of Defendant's Opposition ("Stern Decl.") at ¶ 5 & Exh. 1.) All but one of 83 Account Executives who responded to the survey indicated that they did not want to pursue potential recovery from a class action lawsuit against Defendant seeking minimum wages, overtime pay, and compensation for missed rest and meal periods. (*Id.*) With that information, Defendant sent the Stern Letter to 94 Account Executives on October 8, 2007.[2] Before 1:45 p.m. on October 12, 2007 (at which time, Mr. Stern sent the email communication as ordered by Judge Adler), 52 Account Executives had accepted the settlement offer; ten (10) more expressed a desire to accept the offer after the October 12 email. No Account Executives have indicated they wish to reject the settlement offer (although no rejection per se appears to be required by the terms of the Stern Letter). (*Id.* at 23 ¶¶ 7–9.)

As an initial matter, the Court finds nothing objectionable in the "Survey of ML Stern Account Executives." (Stern Decl. at Exh. 1.) The survey consists of five (5) factually straightforward questions which can be answered by checking "yes" or "no" in four instances, while one question requests the Account Executive's best estimate of how many hours per week she or he worked at M.L. Stern from 2002–2006. There is nothing coercive or even suggestive about the survey.

The Stern Letter, after thanking the Account Executives for responding to the sur-

---

1. Plaintiffs also object to the reference on page 3 of the Stern Letter to the potential for Plaintiffs' recovery to "bankrupt the company."

2. The Stern Letter is dated "September 28, 2007," but Mr. Stern's 28 declaration states that it was sent to the Account Executives on "October 8." (Stern Decl. at 16.)

vey, states that it provides "an update on the lawsuit as well as [an] outline [of] a plan to offer compensation to you in exchange for a release of your claims against M.L. Stern," and asks that the Account Executives respond by October 19, 2007. (Stern Letter at 1.) Section 1 is entitled "Update on the Litigation" and provides a description of the lawsuit, the key legal issue in the case regarding the classification of the Account Executives as either "exempt" or "non-exempt," and the reasons why Mr. Stern believes an aggressive defense against Plaintiffs' claims is sensible for both the company and the Account Executives. (*Id.* at 1–2.)[3]

Section 2 of the Stern Letter is entitled "Potential Class Action" and purports to describe what would take place if the action, currently being pursued by the individual Plaintiffs, were certified as a class action. (*Id.* at 2.) Section 2 goes on to state that while "[t]here is no set formula or calculation for any potential recovery," if Plaintiffs prevail on their theory of the case, "recovery could include wages for the overtime you should have received, penalties for missed meal periods, and reimbursement for any improperly deducted expenses." (*Id.*) This section of the Stern letter concludes by stating that, given what still must take place in the case, trial could occur "as far as two years out," a settlement of all claims "currently appears impossible," and that "Frankly, settling for the amount that the Plaintiffs currently demand would severely impact the company's net capital requirements and make it difficult for M.L. Stern to stay in business and out of bankruptcy." (*Id.*)

In Section 3, entitled "Monetary Compensation," the Stern Letter provides background information about previous settlement structures in wage and hour class actions, including that utilized in "the most recently settled case against Morgan Stanley" (total number of months worked multiplied by $219). (*Id.* at 2–3.) The letter expresses Mr. Stern's belief that "our defense is much stronger than that of Morgan Stanley," notes that "we certainly do

not have the resources of a firm like Morgan Stanley," and then sets out M.L. Stern's settlement offer to the Account Executives: "Total months you have worked during claims period multiplied by $50." (*Id.* at 3.) This section goes on to state that, if the Account Executives agree to accept the company's offer, they will have to sign the attached "Settlement and Release Agreement" (the effect of which is explained), and concludes by stating, "There is no denying that you could potentially recover more should you participate in the class. There is also no denying that your recovery could be less should our attorney's arguments prove persuasive or should the class action Plaintiffs recover an amount that would bankrupt the company." (*Id.*)

Section 4, "Further Consultation," states that while Mr. Stern believes the company's settlement offer is fair, "[y]ou ... need to make a decision for yourself," and suggests that the Account Executive consult with an "attorney of your choosing." (*Id.* at 3.) The letter then sets out contact information for both Defendant's and Plaintiffs' attorneys. (*Id.* at 3–4.)

Section 5, "Further Action," states:

Absolutely no adverse actions will be taken against you no matter what you decide to do. We respect the fact that some of you may chose to take part in the class action and will not harbor any ill will accordingly.

(*Id.* at 4.) Finally, Mr. Stern reiterates that he would like to receive a response "by October 19, 2007." (*Id.*)

For the reasons set forth below, the Court finds that, while certain modifications should be made to the Stern Letter, it is not, on balance, an improper, misleading, or coercive pre-certification communication to members of the proposed class. Accordingly, while the Court rules that an amended letter as ordered herein shall be sent to the Account Executives, and that all Account Executives (including those who previously accepted the offer contained in the original Stern Letter) should be given sufficient time to consider

---

**3.** Although the Stern Letter does not say so, a copy of the Consolidated Amended Complaint is attached to the Stern Letter, following the "Set- tlement and Release Agreement" in which it is referenced.

and respond to the amended letter, all other relief requested by Plaintiffs is *denied.*

### B. *Applicable Law.*

■ This Court has the authority to limit communications between litigants and putative class members prior to class certification, subject to restrictions mandated by the First Amendment. *See Gulf Oil Co. v. Bernard,* 452 U.S. 89, 100, 101 S.Ct. 2193, 68 L.Ed.2d 693 (1981).

> Pre-certification communications to potential class members by both parties are generally permitted, and also considered to constitute constitutionally protected speech. [citations] As such, *any limitations on pre-certification communications between parties and potential class members should be based on a clear record and specific findings that reflect a weighing of the need for a limitation and the potential interference with the rights of the parties.*

■ *Mevorah v. Wells Fargo Home Mortg.,* 2005 WL 4813532 *3 (N.D.Cal.2005) (citations omitted)(emphasis added). "To the extent that the district court is empowered ... to restrict certain communications in order to prevent frustration of the policies of Rule 23, it may not exercise the power without a *specific record showing by the moving party of the particular abuses by which it is threatened."* *Burrell v. Crown Cent. Petroleum, Inc.,* 176 F.R.D. 239, 244 (E.D.Tex. 1997), *citing Gulf Oil,* 452 U.S. at 102, 101 S.Ct. 2193 (emphasis in original). "It is not enough that a *potentially* coercive situation exists.... The court cannot issue an order without evidence that a potential for serious abuse exists." *Burrell,* 176 F.R.D. at 244 (emphasis in original).[4]

In *Keystone Tobacco Co., Inc. v. U.S. Tobacco Co.,* 238 F.Supp.2d 151 (D.D.C.2002), defendant tobacco manufacturer ("UST") presented settlement proposal packets to putative class members (direct purchasers of tobacco). In *Keystone,* the packet contained a cover letter addressed to "our valued customers" and signed by the president of UST, a memorandum assessing the merits of the lawsuit, a settlement offer, and a proposed settlement agreement. *Keystone, supra,* 238 F.Supp.2d at 153. The letter stated that a copy of the complaint was enclosed and provided contact information for plaintiffs' class counsel. *Id.*

After reviewing the packet, the court in *Keystone* noted that "[t]he correspondence itself does not appear to contain any incorrect assertions of fact regarding the current class action or the terms of the settlement agreement" and that the letter "advised customers to consult with their own lawyers before deciding to settle the case or sign the releases." *Id.* at 157. The court concluded that, while the packet "contain[ed] some self-serving advocacy for defendants' position, it [could not] find that the statements therein [were] inaccurate or misleading." *Id.* "All of this suggests that while trying to encourage settlement, the defendants and their counsel took steps to avoid providing inaccurate or misleading information and to assure that they were in compliance with established law." *Id.*

The troublesome issue in *Keystone* was the potentially coercive behavior by some UST salespersons toward putative class members regarding the settlement offer. In *Keystone,* plaintiffs submitted declarations from putative class members that they had been pressured to take the deal offered by UST. One direct purchaser stated that he was contacted on a total of three occasions by a UST employee and was told that "every other wholesaler in Minnesota has signed the Settlement Agreement, and if you don't, you are going to lose your discount." *Keystone, supra,* 238 F.Supp.2d at 157. Plaintiffs' counsel submitted a declaration averring that 12 other direct purchasers had contacted him concerning coercive practices by UST employees. *Id.* at 157–158. Despite these facts, the court concluded, based largely it appears on

---

4. *See also The Kay Co., LLC v. Equitable Production Co.,* 246 F.R.D. 260, 263 (S.D.W.Va.2007) (in case involving plaintiff lessors of oil and gas rights bringing putative class action against leasehold owners alleging knowing and intentional deprivation of rents and royalties, court found that "a limiting order should not be granted based solely on allegations that the defendant wishes to communicate a settlement offer to the putative plaintiffs" and "[a]bsent any specific evidence that the communication is abusive, a limitation is inappropriate.").

the quality of the carefully drafted settlement materials, that "plaintiffs [had] not presented a 'clear record' of abuses that would justify precluding settlement discussions with direct purchasers." *Id.* at 159. Accordingly, the court issued remedial orders directed at eliminating future coercive tactics by UST employees and ordered a letter sent to direct purchasers who had entered into the settlement agreement but had not received a copy of the complaint (as was represented in the original letter) informing them that they could, if they so chose, withdraw from the settlement agreement after reviewing the complaint. *Id.* at 159–160.

The situation in the instant case strikes the Court as remarkably similar to that in *Keystone,* except that Plaintiffs present no evidence of the type of coercive behavior which troubled the court in that case. As discussed in the next section, although the Stern Letter contains "some self-serving advocacy for defendant's position," and although the Court finds that some modifications to the letter are necessary, on balance it evidences a clear intention to avoid inaccuracies and comply with applicable laws. *See Keystone, supra,* 238 F.Supp.2d at 157.

Two California district court cases cited by Plaintiffs, *Mevorah, supra,* and *Wang v. Chinese Daily News, Inc.,* 236 F.R.D. 485 (C.D.Cal.2006), are readily distinguishable on their facts. In *Mevorah,* the plaintiff home mortgage consultants ("HMCs") brought a wage and hour class action against Wells Fargo Home Mortgage, Inc. ("Wells Fargo"). Plaintiffs contended that Wells Fargo "through counsel, [ ] contacted members of the potential class and [ ] made false and misleading statements regarding [the] action and its potential impact." 2005 WL 4813532 at *1. Plaintiffs submitted a declaration of a former HMC who was contacted for an interview by plaintiffs' counsel (while she was still employed by Wells Fargo) and "led to believe that if the action were successful HMCs would no longer be paid by commission, but instead would be paid on an hourly basis." *Id.* The employee was *not* informed by plaintiffs' counsel that she might be eligible to recover overtime pay (as well as continue to be paid on a commission basis) if the action

were successful, she was *not* informed that declining to be interviewed would not impact her job, nor was she informed that she should seek the advice of counsel of her choosing. *Id.*

The court in *Mevorah* noted that "[d]efendant's statements also have a heightened potential for coercion because where the absent class member and the defendant are involved in an ongoing business relationship, such as employer-employee, any communications are more likely to be coercive." *Mevorah, supra,* 2005 WL 4813532 at *4, *citing Belt v. Emcare, Inc.,* 299 F.Supp.2d 664, 667 (E.D.Tex. 2003). On a motion to correct the alleged misrepresentations communicated by counsel for Wells Fargo, the district court found that defendant's communications with putative class members were misleading and improper and ordered that further pre-certification communications be pre-approved by the court, plaintiffs be allowed to depose each individual interviewed by defendant's counsel, and that the parties draft a notice to potential class members regarding the action and a questionnaire to elicit facts pertaining to each individual's employment with defendant. *Id.* at *5–6.

In *Wang,* the class was comprised of former and current non-exempt employees of defendant Chinese Daily News ("CDN"). The district court had granted class certification, and the action was in an opt-out period. The opt-out period overlapped with a contentious union election, and plaintiffs presented employee declarations that CDN management used inflammatory rhetoric and coercive measures in opposing unionization and encouraging opt-outs. For example:

CDN management held mandatory meetings where CDN warned that unions would be divisive, cost the employees money, and that the unions wanted to kill the newspaper. It was in that environment that CDN placed the opt out forms on a table in the workplace. During at least some portion of the opt out period, someone placed a large sign over the table which stated in Chinese, "Don't Tear the Company Apart! Don't Act Against Each Other!" Additionally, Lynne Wang, one of the strong supporters of the unionizing effort and the

lawsuit was terminated in the middle of the opt out period. . . .

*Wang, supra,* 236 F.R.D. at 487 (citations omitted). The court found that the opt outs submitted "were the product of a coercive environment that pressured employees to opt out lest they risk losing their jobs." *Id.* at 489. The court invalidated the opt outs as not the product of independent decision-making. *Id.*

In *Mevorah,* employees were personally contacted by *counsel* for defendant. The evidence in that case showed that the interviews were not even-handed encounters, but contained what can reasonably be inferred to be intentional misrepresentations by defendant's counsel, who took little or no care to apprise potential class members of their rights and options. The interviews were particularly coercive in light of the fact that employees were singled out for one-on-one contact by Defendant's counsel, which in this Court's view was an utterly improper tactic. In Wang, the inflammatory rhetoric, coercive measures, and retaliatory actions undertaken by defendant in order to encourage class members to opt out of a certified class action were specifically documented and presented as evidence to the Court. Here, as noted previously, no such evidence has been presented by Plaintiffs.[5]

### C. The Stern Letter, While Requiring Some Modifications, Is On Balance Neither Coercive Nor Ethically Improper.

■ Plaintiffs contend that the Stern Letter is coercive in numerous ways, for example, by including an arbitrary date by which Account Executives must respond to Defendant's settlement offer. (Motion at 10–11.) The Court agrees that the October 19, 2007 deadline *might* have provided Account Executives too little time to meaningfully respond

to the Stern Letter, especially if the Stern Letter was not sent until October 8, 2007, as indicated in Mr. Stern's Declaration. (Stern Decl. at ¶ 6.) While that fact does not render the Stern Letter inherently coercive, the Court, as set forth below, will provide the Account Executives ample time in which to consider and respond to the revised letter required by this Order. Additionally, Plaintiffs claim to be "appall[ed]" that Defendant included contact information for Plaintiffs' counsel because, Plaintiffs contend, it gives the impression that they acquiesced in or approved of the settlement proposal. (Motion at 12–13.) While it might have been the better practice to notify Plaintiffs' counsel that his contact information would appear in the Stern Letter, the inclusion of that information gives Account Executives direct access to get "the other side of the story" regarding the settlement offer. The Court is at a loss to understand how it could be "appalling" to Plaintiffs' counsel, or in any way coercive or detrimental to the Account Executives' interests, that he might be contacted by members of the proposed class he seeks to represent in this action.

Plaintiffs also contend that the Stern Letter is inherently coercive because it was sent to the current Account Executives of the company. While the Court acknowledges that the existence of an employer/employee relationship increases the possibility of coercion, "[i]t is not enough that a *potentially* coercive situation exists." *Burrell, supra,* 176 F.R.D. at 244 (emphasis in original). Unlike in *Mevorah* and *Wang,* Plaintiffs present no evidence that a coercive environment was created by Defendant or that coercive tactics were used to influence Account Executives to accept the settlement proposal contained in the Stern Letter. On the contrary, the Stern Letter is for the most part an even-handed, albeit allowably partisan,

5. Two other cases on which Plaintiffs rely are also readily distinguishable. In *Kleiner v. First National Bank of Atlanta,* 751 F.2d 1193 (11th Cir.1985), as in *Wang,* defendant engaged in an improper scheme designed to coerce members of a certified class to opt out of the action. *Id.* at 1197–1198. In addition, defendant's conduct was undertaken in knowing violation of a court order instructing defendant to have no contact with class members except in five depositions.

*Id.* at 1196, 1200–1201. In *Belt, supra,* 299 F.Supp.2d at 666, defendant unilaterally sent a letter to the members of the proposed class shortly before a court-sanctioned communication was to be sent to them. The court specifically found that defendant's letter misrepresented numerous facts about the action and that it was coercive because it suggested that the lawsuit could affect the absent class members' employment. *Id.* at 666–668.

communication. The Stern Letter clearly states that the Account Executives might recover more than the company's settlement offer if the case goes to trial, that they should consult with an attorney of their choosing (including Plaintiffs' counsel, whose contact information was provided), and that "[a]bsolutely no adverse actions" will be taken against them, regardless of their response. As in *Keystone*, subject to the required modifications discussed below, the Court finds that Defendant has taken steps to avoid providing inaccurate or misleading information and to comply with applicable laws. (*See* Stern Letter at 3–4.)

Plaintiffs contend that the *mere fact* that more than fifty percent (50%) of Defendant's current Account Executives who received the Stern Letter have elected to execute releases "is clear indicia of the coercive nature of the Stern Letter." (Reply at 5–6.) The Court disagrees. Plaintiffs provide no evidence to support a finding that even a single Account Executive felt coerced or pressured in any way to execute the release. Defendant, on the other hand, provides evidence by way of the Stern Declaration that there are factors which make M.L. Stern a "unique brokerage house" and which could reasonably explain the Account Executives' disinterest in pursuing potential recovery from a class action lawsuit against Defendant. (*See* Stern Decl. at ¶¶ 4–9.)

While the Court finds that the Stern Letter is not, on balance, an improper, misleading, or coercive pre-certification communication to members of the proposed class, it also finds that certain modifications should be made to the letter. First, although the Court finds that paragraphs one and two under Section 1 provide a fair and accurate summary of the lawsuit and the parties' respective contentions on the key legal issue of whether the Account Executives are properly classified as "exempt" or "non-exempt," the Account Executives should be specifically advised of the fact that a copy of the Consolidated Complaint is attached to the letter so that they may review Plaintiffs' allegations in detail. The Court will therefore require that the following language be added to the end of paragraph one under Section 1: "A copy of the Consolidated Complaint in this action is attached for your reference so that you may review Plaintiffs' allegations."

Second, while the Court finds that the third paragraph under Section 1 is not coercive or factually inaccurate for the reasons discussed below, it further finds that language should be added to the paragraph to make clear that, if Plaintiffs' lawsuit is successful, Account Executives will not be prevented from continuing to be paid on a commission basis in addition to receiving required meal and rest breaks and premium pay for authorized overtime hours. The Court finds that this paragraph properly states that if Plaintiffs' theory (i.e., that the Account Executives were improperly classified as "exempt" instead of "non-exempt") is correct, the Account Executives "should have been" treated as hourly workers, thereby necessitating timekeeping. This would have been necessary, as Defendant correctly points out (Opposition at 5), in order to determine required premium pay for authorized overtime hours, as well as the frequency of required meal and rest breaks. The Court further finds that Mr. Stern's opinion, as expressed in this paragraph, that Account Executives function most effectively on behalf of their clients as "exempt" employees, under a system that does not require timekeeping, required meal and rest breaks, and authorization to work overtime hours in order to receive premium pay, is permissible advocacy, reflecting Mr. Stern's belief in the wisdom and benefits of the firm's corporate culture. In addition, the situation here does not begin to approach that in *Mevorah* where, as discussed above, Defendant had its lawyers contact members of the proposed class and led them to believe, *inter alia*, that they would no longer be paid by commission if the lawsuit were successful. No such campaign of coercion exists here, and the wide-ranging relief granted in *Mevorah* is therefore inappropriate. The Court, however, will require that the following sentence be added to the end of the paragraph in order to eliminate any confusion that may exist as to whether the Account Executives will still be able to be paid by commission in the event Plaintiffs' lawsuit is successful: "For these rea-

sons, although Plaintiffs' lawsuit, if successful, would not prevent you from continuing to be paid on a commission basis, in addition to receiving required meal and rest breaks and premium pay for authorized overtime hours, we intend to vigorously defend our current system, pursuant to which you are treated as an 'exempt' employee."

Third, the Court finds that the second sentence under Section 2 should be modified. That sentence currently reads as follows: "The Court would need to certify the case as a class action and, if it does so, it would mean that you could potentially join the lawsuit as a plaintiff against M.L. Stern." This statement incorrectly implies that, if a motion for class certification were granted by the Court, Plaintiffs would then *choose* (i.e., "opt-in") whether to become part of the class. In truth, under Fed.R.Civ.P. 23, the Account Executives would *automatically* become members of the class and would only be excluded from the action if they affirmatively "opted-out" of the class. Accordingly, this sentence shall be replaced by the following sentence: "The Court would need to certify the class as a class action and, if it does so, it would mean that you would automatically participate in the lawsuit against M.L. Stern as a member of the class unless you affirmatively requested to be excluded from the class."

Fourth, the Court finds that the references in the Stern Letter to the potential for Plaintiffs' current settlement demand or a recovery after trial to bankrupt the company should be deleted. While Mr. Stern is entitled to set forth his views of the potential impact of the case on the company's financial condition, the Court finds that the specter of bankruptcy, particularly when raised by the founder and CEO of what is a relatively small company, presents a potential chilling effect on an Account Executive's ability to assess the contents of the Stern Letter objectively. Accordingly, the following changes shall be made: (a) The final sentence of paragraph three under Section 2 shall be amended to read as follows: "Frankly, settling for the amount that Plaintiffs currently demand would severely impact the company's net capital requirements and, in my view,

would make it difficult for the company to stay in business."; and (b) The final sentence of paragraph five under Section 3 shall be amended to read as follows: "There is also no denying that your recovery could be less should our attorney's arguments prove persuasive or should the class action Plaintiffs recover an amount that would have a material adverse effect on the company's financial condition." The Court further finds, however, that while the references to bankruptcy in the Stern Letter should be deleted, they do not warrant the punitive measures and sanctions requested by Plaintiffs given the overall even-handed content and tone of the letter, coupled with the absence of any evidence that any Account Executive felt coerced by its contents.

Lastly, because it appears that the Account Executives may have had only eleven (11) days to respond to the Stern Letter, fairness dictates that they receive additional time to study the letter and the company's settlement proposal and consult with legal counsel of their choosing before deciding whether to accept the offer. Accordingly, the Court will order that the offer contained in the Stern Letter remain open for a minimum of thirty (30) additional days. The Court will further order that those Account Executives who have already accepted the offer contained in the Stern Letter may take the same time to further consider the offer and withdraw their acceptance if they so choose.

## IV. CONCLUSION

While the Court has authority to regulate communications with putative class members where warranted "by a clear record" of "particular abuses," the Court will not impose limitations based on speculation and conjecture, especially in light of the overall non-abusive nature of Defendant's communications with the potential class members. (*See Mevorah, supra,* 2005 WL 4813532 at *3; *Burrell, supra,* 176 F.R.D. at 244.) In this instance, Plaintiffs have failed to establish that Defendant's communications with Account Executives were coercive or ethically improper. Although the Court will require that Defendant send the Account Executives

an amended letter incorporating the modifications discussed herein, it finds that Plaintiffs are not entitled to the additional relief they seek. Plaintiffs' Motion to Limit Ex Parte Communications Between Defendant and Members of the Proposed Class, to Nullify Executed Settlement and Release Agreements, and Impose Sanctions and Attorneys' Fees is accordingly **GRANTED IN PART AND DENIED IN PART.**

Plaintiffs' request for an Order that Defendant send a curative letter is **GRANTED IN PART.** Not later than three (3) business days from the date of this Order, Defendant shall amend the Stern Letter as follows and distribute it to the Account Executives:

1. The date shall be changed to reflect the date the amended letter is transmitted to the Account Executives.

2. The final line of the opening paragraph shall be rewritten as follows: "I ask that you please respond by [a date which is at least 30 days from the date the amended letter is transmitted to the Account Executives]."

3. The following sentence shall be added to the end of paragraph one of Section 1: "A copy of the Consolidated Complaint in this action is attached for your reference so that you may review Plaintiffs' allegations."

4. The following sentence shall be added to the end of paragraph three of Section 1: "For these reasons, although Plaintiff's lawsuit, if successful, would not prevent you from continuing to be paid by commission, in additional to receiving required meal and rest breaks and premium pay for authorized overtime hours, we intend to vigorously defend our current system, pursuant to which you are treated as an 'exempt' employee."

5. The second sentence of the first paragraph of Section 2 shall be rewritten as follows: "The Court would need to certify the case as a class action and, if it does so, it would mean that you would automatically participate in the lawsuit against M.L. Stern as a member of the class unless you affirmatively request to be excluded from the class."

6. The final sentence of paragraph three of Section 2 shall be rewritten as follows: "Frankly, settling for the amount that the Plaintiffs currently demand would severely impact the company's net capital requirements and, in my view, make it difficult for M.L. Stern to stay in business."

7. The final sentence of paragraph five of Section 3 shall be rewritten as follows: "There is also no denying that your recovery could be less should our attorney's arguments prove persuasive or should the class action Plaintiffs recover an amount that would have a material adverse effect on the company's financial condition."

8. The final line, prior to the closing and signature, shall be rewritten as follows: "Please respond to me directly by [the same date as stated in the amended opening paragraph]. Any Account Executive who previously executed the Settlement and Release Agreement may withdraw her or his execution of the agreement by specifically requesting to do so by the same date. If I do not receive a response to the amended letter from an Account Executive who previously executed the Settlement and Release Agreement by that date, I will assume that you still intend to accept the company's settlement offer and will proceed accordingly."

Plaintiffs' requests for Court Orders instructing Defendant and its counsel (a) to cease and desist from having any further communication with proposed class members regarding this lawsuit; (b) to provide Plaintiffs with a copy of all communications to any putative class member that concerns this litigation; and (c) to provide discovery as to the "97 complete surveys" Defendant cites in its September 28, 2007 letter, and copies of all executed "Settlement and Release Agreements" from account executives are **DENIED.**

Plaintiffs' request for the Court to deem any executed releases void and unenforceable is **DENIED.**

Plaintiffs' request for sanctions against Defendant is **DENIED.**

**IT IS SO ORDERED.**