Honorable Roslyn O. Silver, Senior United States District Judge
Plaintiff Secretary of Labor ("Plaintiff") alleges Defendants Austin Electric Services LLC and Toby Thomas, Austin Electric's President, (collectively "Defendants") violated the Fair Labor Standards Act ("FLSA") by failing to pay employees overtime compensation and by failing to keep employee records. (Doc. 1). Plaintiff moved, pursuant to Federal Rule of Civil Procedure 65(b), for a temporary restraining order and preliminary injunction preventing Defendants from interviewing their employees regarding this litigation and from obtaining their employees' declarations, (Doc. 119), and Plaintiff's supplemental briefing requests a variety of additional relief. (Doc. 153). For the foregoing reasons, Plaintiff's motion will be granted in part and denied in part.
BACKGROUND
Plaintiff's complaint alleges Defendants failed to pay their employees overtime compensation and failed to keep employee records, in violation of the FLSA. (Doc. 1). Although discovery is closed,[1] Defendants-apparently without notifying their counsel in this litigation-hired separate *953 counsel, Mses. Pace and Sellers, who then began interviewing Defendants' employees, allegedly in connection with a company-wide, neutral human resources audit (the "audit"). According to Defendants, this audit was an appropriate administrative function of the company in that it sought employee input on a variety of matters including safety practices, anti-discrimination and anti-harassment policies, equipment, timekeeping, paid time off, and paid sick leave. During the audit, Defendants' employees were gathered together for interviews, following which employees were given declarations to sign. These declarations purportedly addressed the topics discussed in the interview: safety practices, anti-harassment/anti-discrimination, and, of significance here, timekeeping practices. (Doc. 124).
Plaintiff alleges Defendants subverted the administrative audit's alleged neutral purpose by using it to take from employees information about this lawsuit, specifically whether employees previously gave information to Plaintiff relevant to this case and, if so, the nature of the information provided. Plaintiff further alleges employees were not informed the interviews were voluntary, and that the declarations employees were asked to sign were to be used in this litigation as waivers of employees' claims to back-pay. As such, Plaintiff requested that this Court enjoin Defendants from continuing the audit.
The Court reviewed the parties' initial filings in connection with Plaintiff's motion and held a hearing on June 1, 2018. (Doc. 135). At that hearing, counsel for both parties surprisingly stated that neither of them had seen or reviewed the employee declarations that were the subject of Plaintiff's request for a preliminary injunction. Because the declarations' content was crucial to resolving Plaintiff's motion, the Court ordered Defendants to produce a random sampling of declarations for the Court's and Plaintiff's review. (Doc. 135).[2] Defendants submitted the declarations on June 8, 2018, (Doc. 146), which the Court and Plaintiff reviewed.
There are three types of declarations, each concerning one of three subjects: safety, professional workplace conduct, and timekeeping/pay. The declarations were allegedly available in both English and Spanish, and interpreters were provided. Since only the timekeeping/pay declaration is relevant here, it will be discussed.
The timekeeping/pay declaration appears to follow two formats. Defendants do not explain the reasons for using one format as opposed to the other, but the primary difference between the two is temporal. Thus, the first declaration format is retrospective in that it asks employees to state, under penalty of perjury, that they "record all the hours [they] work on a timesheet," that they "do not work extra hours unless they are included on [the] timesheet," that "[n]o one has instructed [them] to underreport the hours [they] work," and, finally, that they "have been paid for all hours that [they] worked at the Company." (Doc. 146). This format is reproduced below:
*954 DECLARATION OF
I, _______________________________, declare under penalty of perjury that the following is true and correct. If called to testify in Court about these matters, I could and would competently testify to the following:
1. I am over the age of 18 and a resident of ____________ County, Arizona.
2. I have personal knowledge of the matters stated in this Declaration.
3. I am a _________________________ with Austin Electric Services, LLC (the "Company").
4. I record all the hours I work on a timesheet that I complete and give to the Company each week. I do not work extra hours unless they are included on my timesheet.
5. I have never been told by anyone to not record the hours I work on my timesheet.
6. No one has instructed me to underreport the hours I work.
7. I understand that the Company requires employees to accurately record the hours they work each day.
8. I have been paid for all hours that I worked at the Company.
Dated this ____ day of___________, 2018.
Signature: ______________________
In some instances, however, employees made changes or additions to the retroactive declaration format that have some relevancy. (Docs. 146 at 61, 65; 159 at 4). For example, it is telling that one employee amended the retroactive declaration format with the words "[g]oing forward" so paragraph 4 read "Going forward, I record all the hours I work on a timesheet that I complete and give to the Company each week ...."
The second timekeeping/pay declaration format is forward-looking, and asks employees to state, under penalty of perjury, that they "will record all the hours [they] work on a timesheet," "will not work extra hours unless they are included on [the] timesheet," and will notify human resources or their field operations manager if someone instructs them to underreport their hours. Based upon the sample set of declarations Defendants produced, it appears this format was used far less frequently since, of the twenty-one timekeeping/pay declarations Defendants produced, only four were forward-looking. The forward-looking declaration format is shown below:
*955 DECLARATION OF _______________________
I, __________________________________, declare under penalty of perjury that the following is true and correct. If called to testify in Court about these matters, I could and would competently testify to the following:
1. I am over the age of 18 and a resident of ______________ County, Arizona.
2. I have personal knowledge of the matters stated in this Declaration.
3. I am a ________________________ with Austin Electric Services, LLC (the "Company").
4. I will record all the hours I work on a timesheet that I complete and give to the Company each week. I will not work extra hours unless they are included on my timesheet.
5. If someone tells me to not record the hours I work on my timesheet, I will immediately call my field operations manager or payroll/human resources.
6. I understand from today forward that the Company requires employees to accurately record the hours they work each day.
Dated this ____ day of ____________________, 2018.
Signature: __________________________
After Defendants produced the employee declarations, Plaintiff then filed supplemental briefing in support of its application for an injunction. (Doc. 153). In it, Plaintiff argued the declarations show Defendants are retaliating against employees by soliciting coerced declarations containing false and misleading testimony, that the declarations are designed to identify employees who are cooperating with Plaintiff, that the declarations may undermine Plaintiff's claims for back-pay because they are certainly relevant to the underlying lawsuit, and that employees who signed the declarations may now be hesitant to give full and accurate statements in this action, if doing so would contradict their signed declarations. Plaintiff also requested additional relief beyond an injunction, including that Defendants' employees receive a curative notice reassuring them of their FLSA rights and rectifying Defendants' misconduct. (Docs. 153; 161). In response, Defendants argued they took steps to ensure the employee interviews were not coercive, that Defendants have a right to interview employees about working conditions, that an injunction is not necessary, and that employees need not receive notification that these declarations were inappropriately obtained. (Doc. 159). Plaintiff replied, reiterating many of the same arguments made previously. (Doc. 161). The Court held oral argument on August 8, 2018.
ANALYSIS
I. Plaintiff's Motion for an Injunction
Four factors determine whether a preliminary injunction should issue: (1) whether the party requesting the preliminary *956 injunction has made a strong showing that it is likely to succeed on the merits; (2) whether that party will likely suffer irreparable harm absent a preliminary injunction; (3) whether the party has demonstrated the balance of equities tips in its favor; and (4) whether the party has demonstrated the injunction is in the public interest. Winter v. Nat. Res. Def. Council, Inc. , 555 U.S. 7, 20, 129 S.Ct. 365, 172 L.Ed.2d 249 (2008) (citations omitted).[3] "The rules of evidence do not apply strictly to preliminary injunction proceedings," and thus courts may consider evidence that would normally be inadmissible. See Herb Reed Enterprises, LLC v. Fla. Entm't Mgmt., Inc. , 736 F.3d 1239, 1250 n.5 (9th Cir. 2013) (citing Republic of the Philippines v. Marcos , 862 F.2d 1355, 1363 (9th Cir. 1988) ("It was within the discretion of the district court to accept ... hearsay for purposes of deciding whether to issue the preliminary injunction.").[4] Here, Plaintiff argues the Court should grant an injunction because Defendants' employee interviews are retaliatory and are obstructing Plaintiff's investigation, both of which are ongoing FLSA violations that should be halted.[5]
There is an exquisite balance which guides when a preliminary injunction should be granted in a situation such as this, which can be understood by analyzing the following cases. The first is presented in Acosta v. Southwest Fuel Management, Inc. There, an employer under investigation by the Department of Labor for underpaying its employees began instructing employees "to attend meetings with defense counsel on work time." Acosta v. Sw. Fuel Mgmt., Inc. , No. CV164547FMOAGRX, 2018 WL 2207997, at *2 (C.D. Cal. Feb. 20, 2018). Employees were not told the meetings were voluntary and, in some instances, employees were driven to the meetings by management or other company representatives. Id. During these meetings, employees were instructed "to 'sign papers' or provide a declaration" under "penalty of perjury." Id. Employees were not informed that, by signing the declarations, they "might be giving up [back] wages." Id. Employees also were not informed that the Department of Labor had determined the employees might *957 be owed back wages stemming from the Department of Labor's ongoing lawsuit, or the time period the lawsuit covered. Id. Employees were not given copies of their signed declarations unless they specifically asked for them. Id. Further, the Department of Labor was not informed of the interviews, and was not present when they occurred. Id.
Based on this, the court concluded an injunction either limiting or restricting the employer's ability to communicate with its employees was warranted. Id. at *3 (granting temporary restraining order); see also Acosta v. Sw. Fuel Mgmt., Inc. , No. CV164547FMOAGRX, 2018 WL 739425, at *4 (C.D. Cal. Feb. 2, 2018), vacated in part on other grounds, No. CV164547FMOAGRX, 2018 WL 2207997 (C.D. Cal. Feb. 20, 2018) (concluding entry of a preliminary injunction "limiting and/or restricting [the employer's] ability to communicate with their employees" was warranted, but deciding the "better course [would be] to proceed to a trial on the merits").
Specifically, the court first concluded that, because the employees who signed declarations concerning their wages and working conditions, under coercive circumstances, were potential witnesses in the Department of Labor's suit for back-pay, the Department of Labor would likely prevail on a claim that Defendants' actions violated the FLSA's anti-retaliation provision. Acosta v. Sw. Fuel Mgmt., Inc. , 2018 WL 739425, at *4-*7 ; 29 U.S.C. § 215(a)(3) (The FLSA provides that it is unlawful "for any person ... to discharge or in any other manner discriminate against any employee because such employee has filed any complaint or instituted or caused to be instituted any proceeding under or related to this chapter, or has testified or is about to testify in any such proceeding.").
In addition, the court concluded that "allegations of retaliation for the exercise of statutorily protected rights represent possible irreparable harm ... because retaliatory action for protected activity carries with it the risk that employees may be deterred from engaging in legitimate conduct." Id. at *8 (citations omitted). Further, the court concluded that, because the Department only sought an order "requiring [the employer] to comply with the law," the balance of hardships tipped in the Department's favor. Id. at *9. And finally, the court concluded that, because "[t]here is a strong public interest in favor of enforcement of the FLSA," restricting defendants' conduct would be in the public interest. Id.
In addition, to "eliminate any prejudice or adverse impact caused by defendants' coercive conduct," the court in Acosta v. Southwest Fuel Management subsequently struck the employees' declarations and forbade the employer from introducing them for any purpose at trial, both because they resulted from coercion and because "they were not timely disclosed." Acosta v. Sw. Fuel Mgmt., Inc. , 2018 WL 2207997, at *2. And to further cure any prejudice, the court ordered that employees receive a notice including information about the lawsuit, a reminder that employees need not speak with the Department of Labor or the employer about the claims, that speaking with their employer might adversely impact the Department of Labor's ability to collect back-wages on the employees' behalf, and that their employer could not retaliate against them for working off-the-clock, even if it violated company policy. Id. at *5.
In sum, Acosta v. Southwest Fuel Management demonstrates it is wrong for an employer to obtain employee declarations under coercive circumstances, and that a preliminary injunction may issue to prevent such action. However, as set forth below, an employer's legitimate efforts to educate its employees about company policies, *958 or to investigate prior violations of company policy, are not actionable.
Applying these principles, in Mata v. City of Los Angeles , the court concluded that internal affairs investigatory interviews "seeking to determine whether and to what extent [employees] have failed to comply with [the employer's] express, written overtime policy" were not actionable, and would not be enjoined. Mata v. City of Los Angeles , No. CV076782GAFJWJX, 2008 WL 11338102, at *4 (C.D. Cal. July 3, 2008).[6] Likewise, in the context of a Title VII case, the Ninth Circuit concluded that "group therapy sessions ... designed to better inform the [employer's] workforce of its sexual harassment policy" and "deal with a traumatic workplace situation" were not retaliatory. Brooks v. City of San Mateo , 229 F.3d 917, 928-29 (9th Cir. 2000).
Together, Brooks and Mata demonstrate that an employer may take action to educate its employees about company policies, investigate wrongdoing, and take corrective action based upon wrongdoing uncovered. But an employer is prohibited from obtaining, under coercive circumstances, employee declarations, particularly declarations that are relevant to and go to the heart of a pending claim that the employer failed to fully compensate employees. This is what happened in both Acosta v. Southwest Fuel Management and in this case.
Though there was competent evidence offered by the parties, this Court can resolve the case based on the undisputed evidence. That undisputed evidence establishes the following. First, the structure of the audit must be understood in the context in which it arose. Defendants hired separate counsel, Mses. Pace and Sellers, for the purpose of conducting this audit. Pace explains that she was selected to conduct the audit in part because she and Scott Tonn ("Tonn"), Defendant Austin Electric's co-owner, "are friends and next door neighbors" who "talk frequently about a variety of topics as both of [them] are active in civic and construction industry professional endeavors." (Doc. 145 at 2). Pace explains that she was aware of Tonn's "frustration" that the Department of Labor was insisting it was noncompliant, despite that Austin Electric "believed it was in compliance and has spent a lot of resources to ensure compliance." (Id. at 3). Pace states that she was "surprised that DOL was insisting that Austin Electric continued to be out of compliance," since Austin Electric "appeared to have very good policies in place" and "was very transparent" with employees. (Id. ). Despite that the purported purpose of the audit was to uncover wrongdoing, these representations by counsel indicate a lack of neutrality, and bias against the Department of Labor, when the audit was instituted.
Further, despite that Pace and Defendants were obviously acutely aware of the Department of Labor's ongoing investigation, neither explains why Defendants' counsel in this litigation were not notified that Defendants were hiring outside counsel and conducting an audit, particularly considering the audit concerned critical issues involved in this litigation. Pace and Defendants also do not offer any explanation why the Department of Labor was not informed that this audit would be occurring.[7]
Regarding the audit itself, the undisputed evidence establishes what follows. Employees *959 were instructed to attend interviews on work time. (Doc. 124-1 at 18-19 ¶ 57; Doc. 124-2 at 2 ¶ 6). When conducting the employee interviews, Pace and Sellers never informed the employees that the interviews were voluntary, or that employees could leave. (Doc. 124-1 at 19 ¶ 58 ("[T]he subject of whether employees had a choice to decline the interview never came up."). The interviews generally lasted an hour, although some employees' interview processes took significantly longer. (Docs. 124-1 at 18-19; 124-2 at 2). The interview outline suggests employees would be told that, if they had questions, they "can always talk to" their supervisor or the operating manager, (Doc. 147 at 2), but that employees were not told they could consult a neutral person, such as a lawyer.
During the interviews employees were asked about the specific events in this litigation, including whether they had been instructed to underreport their hours worked and whether they had been paid for all hours worked. (Docs. 124-1 at 10, 15, 18-19; 124-2 at 2-3; 147). These are the critical issues in this litigation.
More particularly, the interview outline states employees would be asked whether they "accurately record all ... hours worked" and whether "anyone instructed [them] to NOT report all the hours [they] work." (Doc. 147 at 5). Then, regardless of an employee's response and likely to solidify the point, the interview outline asks employees "[s]o no one has told you to underreport the hours you work?" (Id. ). Beyond this, the interview outline also notes that, at the conclusion of the interview, employees should be asked "[h]ave you ever been interviewed about human resources matters before," and states that, if employees indicate they had been interviewed by a government agency such as the Department of Labor, they should be asked "the circumstances," the "concerns or issues," "whether they have any questions," and, specifically, whether "the agency [told the employee] that there was any issues or anything wrong or that you were owed money, etc?" (Doc. 147 at 7). Consistent with this, Pace and Sellers clearly acknowledge that they inquired into Defendants' employees' contacts with government agencies, including the Department of Labor, and asked whether the government agency indicated the company had engaged in any wrongdoing. (Docs. 124-1 at 11-12; 124-2 at 3).
However, although the questions to be asked during the interview were documented, it appears employees' specific answers during the interview were not recorded. In fact, the only employee answers that were recorded were apparently those recorded in the written declarations which followed the interviews, declarations which were pre-prepared by the interviewers and were not open-ended forms to be completed by employees.
More specifically, following their interviews, employees were presented with declarations for their signature, under penalty of perjury. (Docs. 146; 147 at 7). The declarations did not inform employees that they could consult counsel prior to signing the declarations, or any other neutral person, or that their decision to sign the declaration was voluntary. (Doc. 146). Further, the declarations did not state that employees might be within the group of employees on whose behalf the Department of Labor was seeking back wages. (Id. ). Employees also were not informed that, by signing these declarations, employees might adversely affect the exercise of their FLSA rights. (Doc. 145-1 at 18). This despite the fact that, as previously noted, the *960 majority of the timekeeping/pay declarations are retroactive. (Doc. 146). In particular, these retroactive declarations asked employees to declare, under penalty of perjury, that they "record all the hours [they] work on a timesheet," that they "do not work extra hours unless they are included on [the] timesheet," that "[n]o one has instructed [them] to underreport the hours [they] work," and, finally, that they "have been paid for all hours that [they] worked at the Company." (Id. ).
Moreover, the record does not indicate that employees were given a choice between forward-looking and retrospective declaration formats. (Id. ). And in fact, at least one employee who had worked overtime and had not been paid for all hours worked was given the retroactive declaration format to sign. (Id. at 61). In addition, a second employee who received the retroactive declaration specifically edited it in an attempt to make it exclusively forward-looking. (Id. at 65). Further, it is particularly significant that employees received declarations covering three topics-safety, professional workplace conduct, and timekeeping/pay-but only the timekeeping/pay declaration asked employees to make retroactive statements.[8] (Doc. 146).
After signing these declarations, employees were not provided a copy of the declarations they signed, despite that they were signed under penalty of perjury.[9] (Doc. 145-1 at 19). And all of this occurred in the context of an ongoing, highly antagonistic lawsuit, brought by Department of Labor, alleging Defendants both failed to properly compensate employees for hours worked and failed to maintain accurate employee records. (Doc. 1).
As a result, several employees contacted Plaintiff to express concerns. It was at this point that Plaintiff, for the first time, learned Defendants were conducting an audit. Employees stated the interviews "began with Defendants' attorneys initially asking safety related questions" but "very quickly" transitioned to asking questions *961 regarding the claims involved in this litigation. Specifically, employees reported being asked whether they provided information to Plaintiff about Defendants' alleged FLSA violations and, if so, what information they provided. Some employees said they lied during the interview for fear they would be retaliated against for reporting Defendants' FLSA violations to the government. In addition, employees stated they felt "blindsided" by the interviews, felt they could not decline to participate in the interviews, and felt "uncomfortable and upset both by the questions and length of questioning." Moreover, "at least one employee" reported that, when he asked if his participation was required, he was informed it was "a mandatory interview."[10] (Doc. 119).
Beyond the employees' statements, other circumstances of the audit instill concern. As previously stated, Defendants do not represent that they have previously conducted such an audit at any point prior to the commencement of this litigation. (August 8, 2018 Hr'g Tr.). Further, although Pace states that audits such as this are "common tools used by employers to evaluate the working environment and the companies' compliance with applicable labor and employment laws," (Id. at 4), nothing suggests that the collection of retroactive declarations during such audits in any way serves that purpose. Indeed, retroactive declaration-collection goes far beyond what would be included in any traditional "audit." See Marriam-Webster's Collegiate Dictionary 81 (11th ed. 2004) (defining an audit as "a methodical examination and review"). Further, though Pace represents that audits such as this may disclose "unknown rogue managers or employees," nothing suggests managers were interviewed as part of this audit, or that managers were asked to sign retroactive declarations regarding their actions. Taken together, these actions suggest this audit-and particularly the collection of retroactive declarations-was taken in response to this litigation, and for the purpose of quashing employees' back-pay claims.
Defendants' conduct is sufficient to warrant the issuance of a limited injunction.[11]
*962 As in Acosta v. Southwest Fuel Management , here Plaintiff is likely to succeed on the merits of a claim that Defendants' actions in obtaining its employees retroactive declarations, under coercive circumstances and during a pending Department of Labor investigation into Defendants' payment practices, violated the FLSA's anti-retaliation provision. Acosta v. Sw. Fuel Mgmt., Inc. , 2018 WL 739425, at *4-*7. It is irrelevant that Defendants did not know which of its employees were potential witnesses in the Department of Labor's suit for back-pay, since the audit was intended to include all of Defendants' employees, and thus necessarily would include employees with claims.
Moreover, as in as in Acosta v. Southwest Fuel Management, Inc. , the employees' pursuit of their statutorily protected rights to full compensation allegedly triggered Defendants' retaliatory conduct. This suggests irreparable harm may result from the continuation of the audit, as employees may be deterred from engaging in protected conduct. Id. at *8. Indeed, in the context of this litigation, the deterrent effect of the Defendants' actions in obtaining their employees' declarations is obvious. Once Defendants obtained the declarations, employees with legitimate claims would be faced with a dire choice. If these employees later testified in this suit that they had not, in fact, been adequately compensated, Defendants could not only use their declarations for impeachment, but could also threaten employees for making false statements under penalty of perjury. Faced with this choice, employees with legitimate claims might decide to forgo their statutory right to compensation, simply to ensure their later testimony in this case remained consistent with the declarations Defendants obtained under questionable circumstances. These concerns are further heightened considering Defendants employ vulnerable populations such as convicts, immigrants, and refugees. (August 8, 2018 Hr'g Tr.).
Further, as in Acosta v. Southwest Fuel Management , Plaintiff only seeks an order requiring Defendants to comply with the law, meaning the balance of hardships tips in favor of granting an injunction tailored to address the interviews' coercive elements. Id. at *9. And finally, because "[t]here is a strong public interest in favor of enforcement of the FLSA," the issuance of a limited injunction would be in the public interest. Id.
Thus, the Court will issue a limited injunction designed to address these elements of Defendants' interviews and declarations. Defendants will be prohibited from requesting employees sign any declarations concerning Defendants' timekeeping policy and pay that are not exclusively forward-looking, which will ensure Defendants do not coerce employees into in any way abandoning the pursuit of their statutorily protected rights to full compensation. See generally Acosta v. Sw. Fuel Mgmt., Inc. , 2018 WL 2207997, at *2. In addition, the Court will require that employees be informed that the meeting is voluntary, be allowed to leave, and be provided copies of any declarations signed. Id. Finally, Defendants should inform employees that they are not to divulge any information they reported to the Department of Labor regarding their wages and this lawsuit. Under no circumstances may employees' contacts with the Department of Labor be inquired into.
Limiting the injunction in this manner will enable Defendants to safely continue meeting with employees to educate them regarding the company's timekeeping, safety, and anti-discrimination and anti-harassment policies, and to solicit employee *963 feedback. See Brooks , 229 F.3d 917, 928-29 ; Mata , 2008 WL 11338102, at *4. In addition, limiting the injunction in this manner will not undermine an employer's freedom of speech. See Acosta v. Sw. Fuel Mgmt., Inc. , 2018 WL 2207997, at *5 ; see generally Horizon Air Indus., Inc. v. Nat'l Mediation Bd. , 232 F.3d 1126, 1136 (9th Cir. 2000), cert. denied, 533 U.S. 915, 121 S.Ct. 2519, 150 L.Ed.2d 692 (2001) ("An employer's free speech right ... is not absolute, however, and must be balanced against the employees' rights ... to be free of coercion[.]") (citation and internal quotation marks omitted).
Further, to "eliminate any prejudice or adverse impact caused by [D]efendants' coercive conduct," first, employees' backward-looking declarations will be stricken such that Defendants cannot use them at trial for any purpose.[12] See Acosta v. Sw. Fuel Mgmt., Inc. , 2018 WL 2207997, at *3. Second, Defendants' employees must be given notice, as set forth at Doc. 153-1. See Acosta v. Sw. Fuel Mgmt., Inc. , 2018 WL 2207997, at *5 (requiring that curative notice be given to employees). Finally, Defendants will be required to produce redacted versions of all worker declarations. These actions will obviate, at this time, any need for the other relief Plaintiff requests in its supplemental briefing.
To be clear, although this Court acknowledges Defendants had a legitimate reason for inquiring into their employees' compliance with timekeeping and other policies, and even for securing declarations stating that employees will comply with those policies going forward, in the context of this case, Defendants have articulated no legitimate reason-and the Court cannot think of one-for requesting their employees sign retroactive declarations stating, under penalty of perjury, that they have never underreported their hours, have never been instructed to underreport their hours, and have been fully compensated for all work done. Likewise, inquiring into employees' contacts with government agencies regarding this litigation serves no legitimate investigatory or educational purpose. Thus, these actions will be enjoined.
II. Defendants' Motion to Deny Plaintiff's Motion for its Failure to File a Reply
Separately, due to Plaintiff's failure to file a reply in support of its original motion requesting injunctive relief, Defendants requested Plaintiff's motion be denied, that the hearing be vacated, and that Defendants be awarded fees and costs. (Doc. 129). Yet, the failure to file a reply is clearly not a basis to deny a motion. L.R. Civ. 7.2(d) (providing that a party may file "a reply memorandum if that party so *964 desires"). Thus, Defendants' motion will be denied.
III. Defendants' Supplement Regarding Newly-Discovered Evidence
During oral argument on August 8, 2018, Plaintiff's counsel represented that he had submitted a "referral for criminal prosecution" based upon the actions of Ms. Petrilli, a former employee of the Department of Labor who submitted a declaration on Defendants' behalf in this case. At that time, the Court cautioned Plaintiff's counsel about pursuing such a course of action without clear authority.
However, in light of Plaintiff's stated decision to refer Ms. Petrilli for criminal prosecution, Defendants now request this Court stay its ruling on Plaintiff's preliminary injunction motion to permit Defendants to submit briefing on the issue of Ms. Petrilli's criminal prosecution. Specifically, Defendants argue that on the same day Plaintiff's counsel informed this Court that it was referring Ms. Petrilli for criminal prosecution, Plaintiff took Ms. Petrilli's deposition in another matter, during which Plaintiff inquired into her consulting practice without informing her that she had been referred for criminal prosecution regarding actions she had taken in connection with her consulting practice. Defendants argue that Plaintiff's actions implicate the doctrine of unclean hands, which should bar the equitable relief Plaintiff seeks here. Defendants represent that they intend to submit briefing on the matter no later than Monday, August 20, 2018.
Even if Defendants' allegations are true, the parties agree that Ms. Petrilli's deposition was taken in connection with another lawsuit. (Docs. 169; 170). If Plaintiff indeed deposed Ms. Petrilli in another proceeding without informing her of her Fifth Amendment rights, assuming that was required, this Court trusts that such misconduct can be adequately dealt with in that proceeding. Further, why Defendants would have consulted with Ms. Petrilli in the first place is beyond comprehension considering Defendants received privilege logs and discovery from Plaintiff showing that Ms. Petrilli was involved in this very litigation during her employment with the Department of Labor. (Doc. 170). For these reasons, Defendants' request to stay these proceedings further will be denied. Further, Defendants will not be granted leave to file a motion regarding Plaintiff's alleged misconduct.
Accordingly,
IT IS ORDERED Plaintiff's Motion, (Doc. 119), is GRANTED IN PART and DENIED IN PART . Defendants may continue meeting with employees to inform them regarding the company's timekeeping policies, to solicit their feedback regarding a variety of other company policies, and to investigate employees' compliance with company policies, although not policies relevant to this litigation without this Court's prior approval. Defendants may not ask employees to sign any declarations regarding Defendants' timekeeping policy unless those declarations are exclusively forward-looking. Employees must be informed the meeting is voluntary, be offered a neutral witness, be permitted to leave, and be provided copies of any declarations signed. Employees' contacts with the Department of Labor may not be inquired into.
IT IS FURTHER ORDERED all backward-looking employee declarations are stricken, and employees shall receive notice from Defendants as set forth above.
IT IS FURTHER ORDERED Plaintiff may resume communications with Defendants' employees.
IT IS FURTHER ORDERED Defendants' Motion, (Doc. 129), is DENIED .
*965 IT IS FURTHER ORDERED Defendants' request for leave to file a motion regarding Plaintiff's deposition of Ms. Petrilli, (Doc. 169), is DENIED .
IT IS FURTHER ORDERED no later than August 22, 2018, Defendants shall provide redacted copies of all employee declarations to Plaintiff.
IT IS FURTHER ORDERED no later than August 31, 2018, Plaintiff shall file a motion requesting leave to amend its complaint. Defendants shall file a response no later than September 14, 2018, and Plaintiff shall file a reply no later than September 21, 2018.
IT IS FURTHER ORDERED the Court will expeditiously resolve the parties' pending motions for partial summary judgment and motion for expert discovery. Thus, this matter is ready to be set for trial on Plaintiff's current claims, though not on any new claims raised in Plaintiff's anticipated motion for leave to amend.
IT IS FURTHER ORDERED Plaintiff shall disclose the identities of its informer witnesses who will testify at trial, and any unredacted documents relating to them, no later than October 1, 2018 .
IT IS FURTHER ORDERED discovery shall reopen for a period of 15 business days, beginning October 15, 2018 , and ending November 2, 2018 , to allow Defendants the opportunity interview and/or depose the Secretary's informer witnesses and other individuals who may be disclosed in the documents and information the Secretary produces pursuant to paragraphs (U) and (V) of the Court's prior scheduling orders.
IT IS ORDERED all Motions in Limine are due November 13, 2018 . Responses are due November 27, 2018 . No replies are permitted unless ordered by the Court. Prior to filing any Motion in Limine, the parties must confer and discuss the contents of each planned motion. No Motion in Limine should be filed if the other party does not oppose the relief requested.
IT IS FURTHER ORDERED the Joint Proposed Pretrial Order, if not already filed, is due December 4, 2018 .
IT IS FURTHER ORDERED the parties will separately file their Proposed Findings of Fact and Conclusions of Law no later than December 18, 2018
IT IS FURTHER ORDERED no later than December 18, 2018 , the parties shall deliver to chambers excerpts of the deposition testimony they propose to present at trial, in compliance with the procedures available on the Court's website (found in Deposition Designation Procedure for Judge Silver), including but not limited to: Plaintiffs highlighting in yellow the portions they wish to offer and Defendants highlighting in blue those portions they wish to offer. If either party objects to the proposed testimony, a specific and concise objection (e.g., "Relevance, Rule 402") shall be placed in the margin adjacent to the proposed testimony.
IT IS FURTHER ORDERED a final pretrial conference is set for January 8, 2019, at 10:30 A.M.
IT IS FURTHER ORDERED trial to the Court is set for January 15, 2019, at 8:30 A.M. Estimated length of trial is 8 days.
IT IS FURTHER ORDERED the parties shall comply with the Exhibit Procedures found on the Court's website at www.azd.uscourts.gov / Judges' Information / Orders, Forms & Procedures for Hon. Roslyn O. Silver.

The parties completed the majority of discovery in October 2017, although they have stipulated to reopen discovery 75 days before trial to permit Defendants to interview and depose Plaintiff's informer witnesses. (Docs. 50; 84).

The Court also ordered both parties to refrain from interviewing Defendants' employees until Plaintiff's motion was resolved. (Docs. 123; 135). The limitations on Plaintiff will now be lifted.

Following Winter , the Ninth Circuit has articulated the standard as requiring: (1) "serious questions going to the merits;" (2) a "balance of hardships" that "tips sharply" towards the party requesting the injunction; (3) a "likelihood of irreparable injury" and (4) that the injunction is "in the public interest." All. for the Wild Rockies v. Cottrell , 632 F.3d 1127, 1135 (9th Cir. 2011).

As mentioned at oral argument, there is reason to believe that the declarations are not hearsay, or if they are hearsay, they are at least reliable because they were apparently simultaneously given to the Department of Labor at the conclusion, and in one case during, the stressful interviews.

Plaintiff makes two additional arguments. For one, Plaintiff argues Defendants are attempting to circumvent the Court's scheduling order, in which the Court stated Plaintiff need not disclose the identities of its informer witnesses until 75 days before trial. This argument is not meritorious. The scheduling order merely states that Plaintiff need not disclose the identity of its informer witnesses until 75 days before trial. The scheduling order does not, however, prohibit Defendants from legitimately independently learning the identity of Plaintiff's informer witnesses. Of course, Defendants may not use coercion in doing so. Beyond this, Plaintiff also requests to add a claim against Defendants and the lawyer responsible for collecting these employee declarations. (Doc. 153 at 8). However, since this request was raised for the first time in Plaintiff's supplemental briefing in support of its motion for an injunction, the Court will not grant Plaintiff's request. Instead, the Court will give Plaintiff leave to file a separate motion requesting leave to amend its complaint to add this claim, and will order Defendants to respond to the motion.

Further distinguishing Mata , it is important to note that, there, the employer had an existing, well-recognized policy requiring the employer to investigate violations of overtime reporting policies. Mata , 2008 WL 11338102, at *3. Defendants have presented no evidence suggesting such a policy existed here.

A hypothesized explanation might be that the auditors intended that the audit would be used only internally to assist the company in developing best practices to ensure compliance with the law and to establish a good working environment for employees. If that was truly the motive, Defendants and Defense counsel should have no objection to precluding the use of the declarations in this, or any, litigation.

The safety and professionalism at work declarations, which employees were also asked to sign during the interview, asked employees to declare, among other things, that they "understand and agree to follow the Company's safety policies, practices, and procedures," "know to report injuries that occur at work," "will not make inappropriate comments," and "will not make inappropriate touchings of other employees." Raising questions regarding the neutrality of the audit, these declarations did not, for example, ask employees to declare, under penalty of perjury, that they had never made inappropriate comments or inappropriate touchings, that they had reported all injuries that occurred at work, or that they had followed the Company's safety policies. (Doc. 146). It cannot be gainsaid that any declaration-collection conducted during an audit that was designed to be completely neutral, as to provide employees with knowledge of company policies and to ensure employees knew them, would merely need to be prospective, not retrospective.

Defendants submitted a letter-not a declaration-from Ms. Pace, in which Ms. Pace represents that "[i]t was the plan and still is the intent to provide employees with copies of their declarations ... upon conclusion of the HR audit." (Doc. 145-1 at 19). However, Ms. Pace's letter did not indicate she ever told the employees that they would later receive copies of their signed declarations and precisely when that would occur. Moreover, the declarations do not state that employees would later receive a copy of their signed declarations. Likewise, the interview outline does not indicate that employees should be informed they would receive a copy of their signed declarations at a future date. Indeed, nothing suggests Defendants' employees were given any reason to expect that they would later receive copies of their declarations, or that they should ask for copies of their signed declarations if they did not. The fact that employees were not simply provided copies of the declarations they signed is further evidence of the coercive nature of Defendants' conduct. Acosta v. Sw. Fuel Mgmt., Inc. , 2018 WL 2207997, at *2.

Plaintiff did not submit any declarations from the employees regarding their interviews, because the scheduling order permits Plaintiff to keep its informer witnesses' identities confidential until 75 days before trial. (Docs. 50; 84). Instead, Plaintiff submitted two declarations from Wage and Hour Investigators who spoke with employees regarding their interviews. Defendants argued the Court could not consider the employees' statements in these declarations because they were hearsay. Defendants are incorrect. The rules of evidence do not apply strictly to preliminary injunction proceedings, and thus this Court may consider the employees' statements for the purpose of deciding whether to issue a preliminary injunction. See Acosta v. Sw. Fuel Mgmt. , 2018 WL 739425, at *6 n.4. And even if the Court did not consider them, it is clear an injunction is warranted based upon the remainder of the undisputed facts recounted above.

During oral argument on August 8, 2018, Defendants argued In re M.L. Stern Overtime Litig. , 250 F.R.D. 492 (S.D. Cal. 2008), demonstrates an injunction is unwarranted. Defendants are incorrect, and that case is easily distinguishable on its facts. In M.L. Stern , a putative class action, the defendant-employer mailed a letter containing a survey to the putative class members. Among other things, this letter expressly disclosed that it concerned the pending litigation and noted that the employer's intent was to "offer compensation to [the putative class members] in exchange for a release of [their] claims against [the employer]." Id. at 494-95. In addition, the letter suggested employees "make a decision for yourself," encouraged them to consult with an "attorney of your choosing," and even provided contact information for both plaintiff's and defendants' counsel. Id. at 495. Most importantly, the plaintiff in M.L. Stern provided no evidence that employees "experienced coercion or felt misled." Id. at 494, 497. Here, the situation is distinguishable in each regard.

The Court considered permitting Defendants to use the declarations for impeachment. But Defendants have repeatedly represented to this Court that the audit-and specifically the gathering of these declarations-was not for use in this litigation. If so, then preventing Defendants from using the declarations in this litigation should cause Defendants no prejudice, particularly since Defendants will have an opportunity to depose Plaintiff's informer witnesses prior to trial. (Doc. 84). Alternatively, if Defendants obtained the employee declarations for use in this litigation, then they were obtained outside of the time permitted for discovery, were not timely disclosed, and were conducted without notifying Plaintiff's counsel. If so, this would be improper. See Fed. R. Civ. P. 30(b)(1), 31(a)(3) (requiring that the opposing party receive notice of depositions by oral and written questions); Fed. R. Civ P. 16(f) (permitting the imposition of sanction for a party's failure to obey a scheduling order); see also Fed. R. Civ. P. 30(b)(5) (requiring that depositions by oral examination be conducted before an appropriate officer); Fed. R. Civ. P. 30(d)(2), 37 (permitting the imposition of sanctions for deposition and discovery misconduct).